## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **EZEQUIEL OLIVARES ABARCA, et al,** individually and on behalf of all those similarly situated; <br><br> **and** <br><br> **WILLIAM SMITH, on behalf of himself, all others similarly situated, and on behalf of the general public,** <br><br> **and** <br><br> **BRIAN VESTER, et al., individually and on behalf of all others similarly situated,** <br><br> **Plaintiffs,** <br><br> vs. <br><br> **WERNER ENTERPRISES, INC., et al.,** **Defendants.** | **8:14CV319** <br> **8:15CV287** <br> **8:17CV145** <br><br> **ORDER** |

This matter is before the Court on two motions to compel filed by the parties. Defendants have filed a Motion to Compel (Filing No. 450 in the Lead Case) requesting a court order compelling Plaintiffs to respond to Defendants' Second Set of Merits-Phase Interrogatories. Plaintiffs primarily object to answering because they believe Defendants have exceeded the 25-interrogatory limit under Fed. R. Civ. P. 33(a)(1). (Filing No. 463 at p. 2). Plaintiffs have filed a Motion to Compel Responses to Interrogatories and Requests for Production (Filing No. 453 in the Lead Case), requesting a court order compelling Defendants to fully respond to contention interrogatories and interrogatories "regarding the magnitude and severity of cargo theft," and to provide responses to certain Requests for Production of Documents (RFPs). Defendants primarily object to these interrogatories and discovery requests because they exceed the scope and limitations set forth in the Court's orders, or seek documents/data and information that is not relevant, not in Defendants' possession, have already been produced by Defendants in some manner, or are patently overly broad and would be overly burdensome for Defendants to produce. (Filing No. 459 at p. 2). The Court will address each motion below.

I.     **Defendants' Motion to Compel**

On May 21, 2015, Defendants served Plaintiffs with their First Set of Interrogatories, consisting of six numbered interrogatories. (Filing No. 452-1 at p. 4). On December 22, 2020, Defendants served their "First Set of Merits-Phase Interrogatories" consisting of nine numbered identical interrogatories upon each of the named plaintiffs. (Filing No. 452-1 at p. 9). On April 3, 2024, Defendants served each named plaintiff with an additional three numbered interrogatories. (Filing No. 452-1 at p. 14). The present dispute concerns the latter two sets of interrogatories. Plaintiffs object to answering these so-called "merits-phase" interrogatories because "Werner has already propounded hundreds of interrogatories on Plaintiffs, exceeding the 25-interrogatory limit by more than ten times." (Filing No. 463 at p. 2; see Filing No. 452-1 at p. 18). Plaintiffs take the position that each interrogatory and their discrete subparts, although identical, must be separately counted and multiplied for each of the six named plaintiffs. Plaintiffs further assert the parties never agreed to separate discovery limits between "class" and "merits" phases of litigation, and therefore Defendants already exceeded their interrogatory allotment prior to serving any "merits" phase discovery requests. (Filing No. 451 at p. 2; Filing No. 463 at pp. 8-9).

As an initial matter, to the extent Plaintiffs deny that the parties agreed "interrogatories served during the class certification-phase do not count against the 25-interrogatory limit at the merits-phase," (Filing No. 463 at p. 8), the Court rejects Plaintiffs' position outright. In the parties' initial Rule 26(f) Report filed on January 20, 2015, the parties agreed that "the case be bifurcated for discovery on class certification and for an initial determination on class certification issues and then discovery on the remaining issues and a determination on the merits." (Filing No. 45). The parties further agreed in their report that the maximum number of interrogatories that each party may serve was 25. (*Id.*). Substantial discovery and litigation took place over the next several years regarding class certification. Once the Court resolved the class certification issues, on August 1, 2018, it ordered the parties to "file an updated Rule 26(f) Report with proposed dates for progression of the merits phase of these consolidated cases." (Filing No. 207). The parties then filed an updated Rule 26(f) Report in which they agreed, "The maximum number of interrogatories, including sub-parts, that may be served by any party on any other party is 25." (Filing No. 210 at p. 26). The parties' updated Rule 26(f) Report for progression of the merits phase therefore established a new interrogatory limit of 25. The parties' agreements, filings, conduct, and Court's orders all clearly contemplated that separate discovery limitations applied

2

during the bifurcated class certification and merits phases of discovery. Thus, Defendants were permitted to serve 25 interrogatories, including subparts, during the merits phase of this litigation.

The next question becomes whether Defendants exceeded their 25-interrogatory limit during the merits phase of litigation. Rule 33(a)(1) of the Federal Rules of Civil Procedure provides, "Unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts"; however, the Court may grant leave to serve additional interrogatories "to the extent consistent with Rule 26(b)(1) and (2)." Fed. R. Civ. P. 33(a)(1). This district's local rules set forth how to count the number of interrogatories, including subquestions. Specifically, "In determining the number of interrogatories, including subquestions, each inquiry seeking a discrete item of information is counted as one interrogatory. For example, the following question is counted as 3 interrogatories: 'Please state the name, address, and telephone number of any witness to the accident set forth in the complaint.'" NECivR. 33.1(c).

Defendants served their "First Set of Merits-Phase Interrogatories" consisting of nine numbered identical interrogatories (Nos. 1-9) upon the named plaintiffs on December 22, 2020. (Filing No. 452-1 at p. 9). Plaintiffs calculate that the nine interrogatories consist of twenty interrogatories, including subparts. (Filing No. 463 at pp. 6-7). On April 3, 2024, Defendants served the named plaintiff with three additional numbered interrogatories (Nos. 10-12). (Filing No. 452-1 at p. 14). Plaintiffs assert Interrogatory No. 10 has four subparts.[1] Plaintiffs then multiply each interrogatory and their subparts by each of the six individually named plaintiffs.[2] Defendants do not offer their own calculation of how many interrogatories, including subparts, they served—their brief only contends their twelve numbered interrogatories should not be multiplied by the six separate plaintiffs. (Filing No. 451 at p. 4).

After review of Defendants' twelve numbered interrogatories (Filing No. 452-1 at pp. 8-14), the Court concurs with Plaintiffs' general calculation that Interrogatory Nos. 1-9 consist of 20 interrogatories including subquestions. The Court calculates that Interrogatory Nos. 10-12 consist

---

[1] This interrogatory asks Plaintiff to "Identify every complaint you made to Werner related to your pay, including the dates, location, and person to whom you complained." (Filing No. 452-1 at p. 14).

[2] In Plaintiffs' brief in opposition to Defendants' motion they assert, "Werner has propounded, and Plaintiffs have answered, 276 Interrogatories." (Filing No. 463 at p. 2). This figure includes the interrogatories propounded by Defendants during the class phase of litigation, which as the Court explained above do not count against Defendants in the merits phase of litigation. Using Plaintiffs' calculations, then, their position is that Defendants' Merits Phase Interrogatory Nos. 1-12 are actually 156 interrogatories including subparts, when multiplied by the six plaintiffs.

of five interrogatories, including subquestions. See NECivR. 33.1(c). As such, Interrogatory Nos. 1-12 contain a total of 25 interrogatories, including subquestions. Thus, the final question becomes whether Defendants' 25 identical interrogatories should be multiplied by each of the six named Plaintiffs, as Plaintiffs argue, or whether, as Defendants argue, the 25 interrogatories should only be counted once.

This is not the parties' first dispute regarding the number of interrogatories permitted to be served by the parties. Recently, the parties disputed whether Plaintiffs exceeded the number of permissible interrogatories, including subparts, served upon Defendants. (Filing No. 424). Plaintiffs took the position that the plain language of Rule 33(a)(1) provides that each party plaintiff is allowed to serve 25 interrogatories, and the six named plaintiffs did not exceed that limit by serving a total of 76 numbered interrogatories (not including discrete subparts). Defendants took the position that the plaintiffs are nominally separate and should be treated as a single party for purposes of Rule 33(a)(1). The Court agreed with Defendants' position that the plaintiffs were nominally separate and concluded, "Plaintiffs are so aligned such that they should be considered as one party under Rule 33(a)(1)" because "[t]hey are represented by the same attorneys, are pursuing identical claims under identical legal theories on a classwide basis, claim to be similarly situated, and have otherwise acted in unison throughout this litigation." The Court further stated, "Permitting each plaintiff to serve Defendants with 25 interrogatories would result in duplicative and "abusive" discovery obligations upon Defendants, but "given the size and complexity of this litigation," the Court permitted "Plaintiffs to withdraw their previously served and unanswered interrogatories" and gave them "leave to re-serve Defendants with an additional total of 50 interrogatories, including discrete subparts." (Filing No. 424).

Here, the Court again agrees with Defendants: Defendants have only served 25-interrogatories including subquestions upon Plaintiffs during the merits phase of litigation. The interrogatories are identical. Each Plaintiff only has to answer 25 of the same interrogatories – the plaintiffs are not answering six sets of 25 different interrogatories. Defendants are requesting the same information in the identical interrogatories—the fact that the plaintiffs may have different answers does not change the fact that Defendants have only served 25 interrogatories, as they had a right to do. This is not inconsistent with the Court's previous position and ruling. Accordingly, the Court overrules Plaintiffs' objections to answering interrogatories based on their position that

Defendants have exceeded the number of permissible interrogatories because Defendants as a side properly served 25-interrogatories upon Plaintiffs during the merits phase of this litigation.

In Defendants' brief in support of their motion to compel, they also ask the Court to overrule Plaintiffs' substantive objections to Interrogatory Nos. 10-12. Specifically, Plaintiffs objected that Interrogatory No. 10, which asks for the identity of every complaint made to Werner related to their pay, as vague and ambiguous with respect to the term "complaint," and also based on attorney-client and work product privileges. Plaintiffs also objected to Interrogatory Nos. 10-12 as being "overbroad as to time." Plaintiffs did not address these objections in their brief opposing Defendants' motion; Plaintiffs only discussed their objections to answering interrogatories based upon their flawed interpretation and calculation of the interrogatory limit.[3] The party resisting a motion to compel "has the burden of showing its objections are valid by providing specific explanations or factual support as to how each discovery request is improper" and also "has the burden to show facts justifying its objection by demonstrating that the time or expense involved in responding to requested discovery is unduly burdensome." *Online Res. Corp. v. Joao Bock Transaction Sys., LLC*, No. 8:13CV231, 2014 WL 5173118, at *4 (D. Neb. Oct. 14, 2014) (citing *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 511-12 (N.D. Iowa 2000)). After review, the Court finds Defendants' Interrogatory Nos. 10-12 are not facially overbroad, vague, or otherwise improper, and Plaintiffs have failed to meet their burden to show their objections to Defendants' interrogatories are valid. Accordingly, the Court will grant Defendants' motion and require Plaintiffs to fully and completely answer Defendants' merits phase Interrogatory Nos. 1-12.

## II.    Plaintiffs' Motion to Compel

Plaintiffs have filed a motion to compel Defendants to provide full responses and documents to the following discovery requests: (1) Request for Production No. 1 (Sixth Set), which seeks certain data about the Class; (2) Request for Production No. 3 (Sixth Set), which requests "exemplar versions of itemized wage statements furnished to California Class Members after 2015"; (3) Requests for Production No. 4 (Sixth Set), No. 1 (Ninth Set), and Nos. 3-5 (Eleventh

---

[3] Plaintiffs also argue Defendants have not established or articulated a reason to exceed the interrogatory limit, Filing No. 463 at pp. 9-11, an argument which the Court need not address because it finds Defendants have not exceeded their interrogatory limit.

Set), which seek the "preformatted messages available for driver supervisors to send to drivers through their onboard devices"; (4) Contention Interrogatories; (5) Requests for Production No. 7 and 8 (Eleventh Set), which seek documents containing the job descriptions and actual job duties of Werner employees identified as fact witnesses in Werner's Second Supplemental Rule 26(a)(1) Initial Disclosures served on February 16, 2024; (6) Requests for Production No. 2-10 (Fourth Set) and No 1 (Twelfth Set), which seek a data table entitled "TSACDRVP"; and (7) *Abarca* Plaintiffs' Interrogatories No. 32 and 33, "which seek information regarding the magnitude and severity of cargo theft." (Filing No. 453). Defendants object to these discovery requests as seeking documents and data that are either not relevant, not in Defendants' possession, have already been produced by Defendants in some manner, or are patently overly broad and would be overly burdensome for Defendants to produce. (Filing No. 459 at p. 2).

## STANDARD OF REVIEW

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). The proportionality analysis requires the court to weigh "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "Rule 26(b) of the Federal Rules of Civil Procedure is widely recognized as a discovery rule which is liberal in scope and interpretation[.]" *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992) (citation omitted). The broad scope of Rule 26 generally allows discovery "unless it is clear the information sought can have no possible bearing on the case." *Ingram v. Covenant Care Midwest, Inc.*, 2010 WL 1994866, at *3 (D. Neb. 2010). But, "[w]hile the standard of relevance in the context of discovery is broader than in the context of admissibility . . . this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery," and "[s]ome threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." *Id.* (internal citations omitted). Because discovery rules should "'be construed to secure the just, speedy, and inexpensive determination of every action' . . . judges should not hesitate to exercise appropriate control over the discovery process." *Blackmore v. Union Pac. R.R. Co.*, No.

8:21CV318, 2022 WL 3718115, at *5 (D. Neb. Aug. 29, 2022) (quoting *Misc. Docket Matter No. 1 v. Misc. Docket Matter No. 2*, 197 F.3d 922, 927 (8th Cir. 1999)).

      1.  *Request for Production No. 1 (Sixth Set) - Driver Data*

      Plaintiffs request that the Court order Defendants to supplement their response to RFP No. 1 (Sixth Set), which asks Defendants to "produce a CSV extraction of the database table(s) that populate the driver information screen . . ., providing the following information for each Class Member: Name, Employee Number, Tractor Number, Status, Address, Phone, Hire Date, Seniority Date, and Position," and to "provide the date(s) of the change and provide all versions of the information" to the extent the information has changed during the class period. (Filing No. 455-1 at p. 11). This RFP stems from a "driver information screen" produced by Defendants:

```
PLIAPEN                  PERSONNEL MAINTENANCE              4/14/15 15:34:59
Name..........: FRANK A EADS
Nickname .....:                    Tractor#.:  60292
Soc Sec Number: 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        Employee#:  0490255 Status........: A
Birth Date....: 4/05/1976                              Cost Division.: TC
Co-Driver.....:                                        Physical Exp..: 5/07/15
Approve/Reject: A  12/05/12        SAFETY NEEDS - 1ST   Relationship..: EMPLY
CDL: St CA  No: B4688333           Eff: 11/01/11  Exp:  4/05/16  Temp: N
CURRENTLY ON-DUTY NOT DRIVING SINCE 04/14/15 1512 LAST UPDATE 04/14/15 1537
Address.......: 20843 WAALEW RD APT 144                Recruiter Init:
City/State/Zip: APPLE VALLEY       CA  92307           Dispatcher....: PC
Phone.........: (760) 646-9605                         SDM Initials..: RA
```

WRN-RUSSELL00001033.

      Plaintiffs state they now seek "the data used to populate this driver information screen for all class members," as such information is relevant to Plaintiffs' claims. Specifically, Plaintiffs contend job history data "is necessary to ensure the accuracy of Plaintiffs' damages models and calculations" because it will allow them "to avoid inadvertently calculating damages for a time period when a class member's driving logs show they were driving, but they were in a class-ineligible position, such as independent contractor," and could also be a "crosscheck for the accuracy of Werner's other data." (Filing No. 454 at p. 6). Plaintiffs further maintain class members' states of residence are relevant to the parties' claims and defenses. Plaintiffs represent

they "offered to limit the request to only specific fields," and Defendants "at one point offered to produce data regarding class members' hire and termination dates but later withdrew that offer." (Filing No. 454 at pp. 5-6).

Defendants respond that they have already produced a substantial portion of the data requested by RFP No. 1 through the Class List and log data; specifically, the Name, Employee Number, Tractor Number, Address, Phone Number, and Social Security Number of class members. Defendants assert Plaintiffs can determine whether a driver was a team or solo driver through the "Second Driver" column on the log data, which is populated with the driver number of a teammate at the time of a duty status record. (Filing No. 459 at p. 4). Defendants also represent they already provided addresses for each class member in the class list, and that "consistent with the Court's definition of the California Class—'California law applies to drivers who are residents of California[] when they are picking up or dropping off a load in California'"—defense counsel has explained that Defendants previously identified members of the California Class by identifying "all trips during the class period with a pickup or drop off in California and then look[ing] to see whether, at that time, any drivers on that load had a California address." (Filing No. 459 at p. 6). Defendants maintain that the remaining class member information requested by Plaintiffs—each driver's status, hire date, and seniority date—is not relevant because that information "has no bearing on whether Plaintiffs were paid all wages owed to them under California or Nebraska law under the facts of this case." (Filing No. 459 at p. 4). Defendants contend Plaintiffs also do not explain the relevance of several categories of other information contained in the above driver information screen, such as nickname, birth date, co-driver, CDL state, CDL number, CDL effective date, referral first name, referral social security number, etc. Defendants assert the additional data sought by Plaintiffs is irrelevant and constitutes an unduly burdensome and overly broad request that is not proportional to the needs of the case. (Filing No. 459 at p. 3).

Aside from the above objections, Defendants state there is no single table or data set from which they can access and readily produce the requested data, but they must instead pull the data from several sources. (Filing No. 459 at pp. 4-5). "In the spirit of compromise," Defendants state they had proposed "to produce the hire and termination dates" for class members if Plaintiffs withdrew their request "for all information from the driver information screen–including the nickname, birth date, codriver, CDL state, CDL number, CDL effective date, CDL expiration date, whether CDL is temporary, recruitment approve/reject designation, cost division, physical

expiration date, relationship (employee or owner operator), recruiter initials, dispatcher initials, sdm initials, comments, veteran status, previous months experience, company name, referral last name, referral first name, referral social security number, and date referral bounty paid[.]" Contrary to Plaintiffs' assertion, Defendants state they never "withdrew" this offer; Plaintiffs did not accept it. (Filing No. 424 at p. 5).[4]

Defendants further argue that Plaintiffs' position that this data is "necessary to ensure the accuracy of their damage calculations" because it will "provide a cross-check for the accuracy of Werner's other data" is a concession that the data Plaintiffs seek is not independently relevant, but is instead data that will "bolster" the other data already in their possession. (Filing No. 459 at p. 5). Defendants assert "Plaintiffs are simply wrong" when they argue data about each driver's "position" is necessary to calculate damages and will help Plaintiffs determine time periods a driver was working as an independent contractor. (Filing No. 459 at p. 5). Defendants represent the Class Lists they already produced include only drivers who worked as non-student employee drivers during the class period, and the Driver Logs provided by Defendants only include data for time period when each driver was working in as a non-student employee driver. As such, Defendants claim the data sets already in Plaintiffs' possession allow Plaintiffs to determine when class members drove as nonstudent employee drivers, and Plaintiffs do not identify any examples of how that information has been inadequate. *Id.*

Plaintiffs contend this data is relevant to both their claims and defenses because, although the Court has ruled that "California law will apply to the class of California resident truck drivers who picked up or dropped off loads in California," Plaintiffs argue the "ruling did not specify how the claims of the small number of individuals who only lived in California for part of the class period should be treated." Further, Plaintiffs assert Defendants indicate they "intend[] to fight the application of California law to at least some members of the California Class," specifically because "California law only applies to drivers who have a base of operations in California or who spend more than 50 percent of their work time in California." (Filing No. 454 at pp. 6-7) (citing Filing No. 455-1 at p. 83).

---

[4] In reviewing Plaintiffs' exhibits, it is apparent Plaintiffs simply did not accept Defendants' proposal to resolve this dispute by Defendants producing only "hire and termination dates for members of the class," as Plaintiffs would not agree to limit other data subject to this request. (Filing No. 455-1 at p. 4 ¶¶ 4-5).

After review of the parties' arguments, the Court finds Plaintiffs have met their burden to show that class member hiring and termination dates, and California class members' states of residence, are relevant to Plaintiffs' claims and to rebut Defendant's affirmative defenses, and are necessary for calculating penalties and/or damages. See, e.g., *Marquis ProCap Sys., LLC v. Novozymes N. Am., Inc.*, No. 8:20CV395, 2021 WL 119570, at *3 (D. Neb. Jan. 13, 2021) ("The scope of relevant discovery is extremely broad. 'Discovery requests should be considered relevant if there is any possibility the information sought is relevant to any issue in the case and should ordinarily be allowed, unless it is clear the information sought can have no possible bearing on the subject matter of the action.'"). Defendants have not produced evidence or otherwise quantified the burden and expense associated with producing that specific data. See, e.g., (Filing No. 367 at p. 8) ("Werner is the party with access to the information and has greater resources. Though Werner presented evidence that complying with the request would require some effort, it did not quantify the expense of complying."). Accordingly, the Court finds Defendants must produce data regarding class members' job history, including hiring and termination dates, California class members' states of residence throughout the class period, and fields necessary to connect the data to drivers, such as unique employee ID, assigned tractor number, or social security number. (Filing No. 482 at pp. 4-5). However, because Plaintiffs have not explained the relevance of any other data fields contained within the driver information screen, the Court will not order Defendants to produce data outside this scope.

2. *Request for Production No. 3 (Sixth Set) - "Exemplar" wage statements furnished to California Class Members*

Plaintiffs next request that the Court order Defendants to supplement RFP No. 3 (Sixth Set), which requests production of "an example of each and every Version of the Itemized Wage Statement that Werner furnished to California Class Members at the time of each payment of wages during the Class Period." The request explains that "Itemized Statement" has the "same meaning as in California Labor Code section 226(a)," and a "Version" means "a form of itemized statement that differs from other forms in either of the following respects: (1) the categories of information appearing on the statement; or (2) the source(s) or method(s) used to generate the information appearing on the statement." (Filing No. 455-1 at p. 15). Plaintiffs seek "one wage statement to represent each substantive change Werner made to the form of the statement during the class

period." (Filing No. 454 at p. 7). Plaintiffs state Defendants have "refused to produce any wage statements other than those belonging to the Named Plaintiffs," extending through 2015. (Filing No. 454 at p. 7). Plaintiffs assert this RFP seeks documents relevant to their claim Defendants failed to meet California statutory obligations requiring itemized wage statements. See Cal. Lab. Code § 226.

Defendants object that this request is unduly burdensome and not proportional to the needs of the case. Defendants state they produced the pay data from which all pay statements provided to Plaintiffs during the class period were generated. Defendants state they do not maintain copies, electronically or otherwise, of actual pay statements sent to drivers, and therefore cannot produce a "version" of a historical pay statement provided to drivers "without a significant undertaking." Defendants have explained that, in their regular course of business, they maintain electronic records of the driver pay information reflected in each employee's pay statement, but do not keep copies of the actual pay statements themselves. Defendants assert their recordkeeping practice complies with California law. (Filing No. 459 at p. 7) (citing *Noori v. Countrywide Payroll & HR Sols., Inc.*, 257 Cal. Rptr. 3d 102, 104 (Cal. App. 3d 2019) (citing Cal. Lab. Code, § 226(a)).

Defendants also state they have identified certain changes it made to itemized pay statements since the 2015 pay statement produced at WRN-RUSSELL00003852, including changes in March 2016, June 2017, September 2019, and May 2020. (Filing No. 455-1 at pp. 15-16). Plaintiffs respond that Defendants' narrative response is insufficient because (1) the narrative is contained in a response to a request for production and is not verified (2) it will be difficult for the trier of fact to evaluate whether wage statements comply with statutory requirements without looking at an actual wage statement. (Filing No. 454 at p. 8). Plaintiffs further assert the data Defendants produced is an inadequate substitute for producing wage statements because Plaintiffs' claims depend on whether the wage statements themselves contained the information they were required to. (Filing No. 454 at p. 8).

Plaintiffs contend Defendants had a statutory obligation to maintain accurate copies of the wage statements under Cal. Lab. Code § 226(a). (Filing No. 454 at p. 8). Under California law, employers are required to provide an "itemized wage statement" to each employee either "semimonthly or at the time of each payment of wages." Cal. Lab. Code § 226(a). This section further specifies, "The deductions made from payment of wages shall be recorded in ink or other indelible form, properly dated, showing the month, day, and year, and a copy of the statement and

11

the record of the deductions *shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California." *Id.* A "copy" "includes a duplicate of the itemized statement provided to an employee or a computer-generated record that accurately shows all of the information required by this subdivision." *Id.* Defendants assert that in their regular court of business and in accordance with California law, they maintain logs of the raw driver data used to populate employee pay statements, which data has already been produced. (Filing No. 459 at p. 7).

Under Fed. R. Civ. P. 34(a)(1), parties can only be compelled to produce documents in their "possession, custody, or control." Defendants state they are not in possession of the requested wage statements. The Court cannot order Defendants to produce what they do not have. See *Cody Foster & Co. v. Urb. Outfitters, Inc.*, No. 8:14CV80, 2015 WL 4366162, at *6 (D. Neb. July 16, 2015) ("Defendants cannot be ordered to produce what they do not have and cannot reasonably obtain."). Nor does Rule 34 require Defendants to create a document that does not exist. See *Stedillie v. Milford Cas. Ins. Co.*, No. 4:23-CV-04048-KES, 2024 WL 449630, at *10 (D.S.D. Feb. 6, 2024) ("A request for production under [Rule] 34 cannot require a party to create a document that does not exist[.]") (citing *Farmers Ins. Exch. v. West*, Civ. No. 11-2297 (PAM/JJK), 2012 WL 12894845, at *5 (D. Minn. Sept. 21, 2012) ("[I]t is axiomatic that no party is required to create documents in response to a Rule 34 request for production of documents.").

"All parties are entitled reasonable access to 'all evidence bearing on the controversy between them, including that in control of adverse parties. This, of course, requires the absolute honesty of each party in answering discovery requests and complying with discovery orders.'" *Wagner v. Dryvit Sys., Inc.*, 208 F.R.D. 606, 609 (D. Neb. 2001) (quoting *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 91 F.R.D. 574, 576 (S.D.N.Y. 1981). "The parties have a duty to provide true, explicit, responsive, complete and candid answers to discovery, . . . and their attorneys have a continuing duty to advise their clients of their duty to make honest, complete, non-evasive discovery disclosures, as well as the spectrum of sanctions they face for violating that duty." *Id.* at 609-10 (internal citations omitted). "Providing false or incomplete discovery responses violates the Federal Rules of Civil Procedure and subjects the offending party and its counsel to sanctions." *Id.* at 610 (citing *Hogue v. Fruehauf Corp.*, 151 F.R.D. 635, 637 (N.D. Ill. 1993). While there is no requirement that responses to document production requests be signed under oath by the party, "when appropriate, the court may order a party to formally verify under oath that either no

12

responsive documents exist, or if they exist, that all responsive documents have been disclosed." *Id.* (citing *In re Control Data Corp. Sec. Litig.*, No. 3-85-1341, 1988 WL 92085, at *6-7 (D. Minn. Feb. 22, 1988)).

Defendants represent they do not possess the wage statements requested by Plaintiffs responsive to RFP No. 3 (Sixth Set), but have produced the data that was contained within employee wage statements. Accordingly, the Court will not order Defendants to produce "exemplar" versions of wage statements they do not have. Under the circumstances, however, the Court will direct Defendants to "formally verify under oath that either no responsive documents exist, or if they exist, that all responsive documents have been disclosed." See *Wagner*, 208 F.R.D. at 610. Because Plaintiffs also accurately point out that Defendants' narrative response explaining the yearly changes to the wage statements was not verified, the Court will further order Defendants to verify under oath that narrative response to this RFP. Whether or not Defendants' recordkeeping complies with Cal. Lab. Code § 226(a) is not the question presently before the Court, and thus the Court declines Plaintiffs' request to find Defendants are "in breach of its recordkeeping obligations under California law," (Filing No. 482 at p. 5), by Defendants' representation that such wage statements are not in their possession.

### 3. Plaintiffs' Requests for Production No. 4 (Sixth Set), No. 1 (Ninth Set), and Nos. 3-5 (Eleventh Set), seeking "preformatted messages"

Plaintiffs request production of all versions of "preformatted message templates that were available for driver managers to send to the drivers they were supervising or coordinating." (Filing No. 454 at p. 9). Plaintiffs assert Defendants' onboard messaging system used to communicate with drivers contains "numerous preformatted message templates" that are "important to this case because they imply the existence of company-wide policies and practices." (Filing No. 454 at p. 9). Plaintiffs specifically ask the Court to compel Defendants to supplement their responses to Requests for Production No. 4 (Sixth Set), No. 1 (Ninth Set), and Nos. 3-5 (Eleventh Set), set forth in full below.

Plaintiffs' RFP No. 4 (Sixth Set) asks Defendants to "produce the text of Macro 39, and any other macro that is used to obtain an employee cash advance from Werner, as it appears or has appeared on Class Members' onboard communication devices (e.g., Qualcomm) prior to being

filled out and submitted, in every variation that has existed during the Class Period." (Filing No. 460-2 at p. 8).[5] Plaintiffs' RFP No. 1 (9th Set) asks:

> Produce documents sufficient to show the unique versions of text and corresponding macro numbers of all macros used by Werner personnel (such as fleet supervisors, fleet managers, and dispatch) who communicate with class members through the trucks' messaging system to send messages to class members, for the time period of June 4, 2010 to November 6, 2023. A list of common macros and their text that are sent by class members was produced at WRN-RUSSELL00041440-41492. This request seeks documents that provide similar information about the number and text of macros sent to class members.

(Filing No. 460-7 at p. 2). Plaintiffs' RFP Nos. 3-5 (11th Set) ask Defendants to "Produce DOCUMENTS sufficient to show screen shots of all pre-formatted messages . . . in the Telemetrics system available to Fleet Managers, Fleet Coordinators, and any other WERNER employee who receives and responds to Macros messages" (RFP No. 3); "in the Omnitracs system available to Fleet Managers, Fleet Coordinators, and any other WERNER employee who receives and responds to Macros messages" (RFP No. 4); and "in the Edge Connect system available to Fleet Managers, Fleet Coordinators, and any other WERNER employee who receives and responds to Edge Connect messages." (Filing No. 461-6 at pp. 3-6).

Defendants respond that Plaintiffs have access to "every preformatted message sent through an onboard messaging device during the class period via the native tables of the Qualcomm messaging data" which, when linked together, contain the text of every message exchanged during the class period and the corresponding macro numbers for these messages. (Filing No. 459 at p. 10). Defendants state they provided a letter to Plaintiffs' counsel outlining the process for identifying macro messages:

> [W]e refer you to columns L and M in the OMMSDIR table, which contain Macro Type (Direction) and Macro Number, as well as columns F and G of the OMMSHDR table, which contain Macro# or Binary Data Type and Macro Ver# or Binary Subtype. In addition, Columns H, I, and J of the OMPOSHIS table contain associated Macro Type, Assoc Mac# or BinaryDataType, and Assoc MacVer# or

---

[5] Defendants also maintain their objection that, "as worded, this request amounts to an Interrogatory seeking factual information, not a request for a document, as it asks Werner to *describe* the text of Macro 39 and other macros." (Filing No. 459 at p. 11 fn. 11) (emphasis added). Defendants contend Plaintiffs' request for Defendants to produce "the text of" certain macros are improper because the "text of" every message is contained in the messaging data; also this request "improperly seeks factual information, rather than documents, in the nature of an interrogatory" in violation of Rule 34. (Filing No. 459 at p. 13). The Court overrules that objection because this RFP does not ask Defendants to describe anything; it plainly asks Defendants to "produce the text of" certain macros as they appear or appeared on Qualcomm or other onboard communication devices, which is a proper Rule 34 request seeking production of "any designated documents or electronically stored information[.]" Fed. R. Civ. P. 34(a)(1)(A).

> BinarySubtype. . . . We have already confirmed Werner does not maintain a "key"
> or "table" of historical macro messages, including macros sent to drivers.

([Filing No. 459 at p. 11](#)) (citing Exhibit H, Def. Feb. 26, 2024, Letter to Plaintiff, at 1-2).

Plaintiffs respond that Defendants incorrectly contend "the universe of responsive documents is contained within the messaging data," and improperly direct Plaintiffs "to search those messages—all six terabytes of data and billions of rows—to find responsive information." Plaintiffs assert the messaging data alone is not responsive to this request because the data does not contain the preformatted message "templates" themselves, just the "completed and sent" messages. Plaintiffs speculate "it is almost certain that responsive documents exist outside of the messaging data"; and "even if the templates do not exist outside of the messaging data, [Defendants] must identify the relevant portions of that data" because requiring Plaintiffs to search vast amounts of Defendants' data for responsive documents runs afoul of Rules 33(d) and 34. ([Filing No. 454 at pp. 9-10](#)).

Defendants represent they have "no record of or database containing all preformatted templates available on the messaging system during the class period" and they have "no obligation to create such records, particularly when the requested data has already been provided in the format in which it was maintained." ([Filing No. 459 at pp. 12-13](#)). Plaintiffs reply that this assertion is "suspect" and asks the Court order Defendants "to provide a declaration detailing its search for responsive documents." ([Filing No. 482 at p. 8](#))  Plaintiffs request that the Court order Defendants to conduct a diligent search and produce responsive documents outside of the messaging data, and to provide Plaintiffs with a declaration that (1) details the scope and nature of their search for responsive documents and (2) indicates whether all responsive documents have been produced. Plaintiffs further ask that, to the extent Defendants continue to respond to these requests by directing Plaintiffs to the messaging data, the Court order Defendants to supplement their responses to identify specific documents and data or produce indices and other tools to guide Plaintiffs to the documents responsive to each individual request. ([Filing No. 454 at p. 11](#)).

After the instant motion was fully briefed, Plaintiffs filed the Supplemental Declaration of Andrew P. Lee on September 6, 2024. ([Filing No. 502](#))  According to this declaration, on August 28, 2024, he took the deposition of Werner's Transportation Manager, Brittney Rohrig, during which she "identified Werner's messaging system as 'AS400,' and confirmed that she regularly sends preformatted messages to Werner drivers under her supervision." ([Filing No. 502 at p. 2](#), ¶

15

3).  This declaration further asserts Ms. Rohrig testified "she received training materials regarding the AS400 messaging system, including 'paper copies' that showed "screenshots of a message or how to process a message,'" and further "described the process she follows in sending preformatted messages to drivers from her computer." (*Id.* at ¶¶ 3, 5). Plaintiffs assert this testimony demonstrates responsive to their requests exist outside of the messaging data. (*Id.* at ¶ 6).

Defendants sought to strike Lee's Supplemental Declaration as it was filed without the Court's leave, or in the alternative, be given leave to file a surreply; the Court granted the latter request. (Filing Nos. 505-507). Defendants assert none of Plaintiffs' RFPs at issue reference "training materials," so Ms. Rohrig's testimony regarding training materials and a handbook do not contradict Defendants' arguments in opposition to Plaintiffs' Motion to Compel. Defendants further assert Ms. Rohrig's testimony that "she has seen training materials which include screenshots of messages comes as no surprise to Plaintiffs because, as Plaintiffs acknowledged in their brief filed in June 2024, Werner produced various training materials containing screenshots of preformatted messages in this litigation." Defendants state that, as they have repeatedly explained, "Werner does not, in its regular course of business, maintain 'screenshots' depicting the templates of all preformatted messages that have been available in its system at any point between June 4, 2010 and November 6, 2023." (Filing No. 505-1 at p. 4). Defendants also assert "Ms. Rohrig's testimony that she has seen a list of preformatted message options should come as no surprise to Plaintiffs because Werner produced a list of the preformatted messages available through the current messaging system and Plaintiffs' counsel deposed Werner's corporate representative regarding that list." (Filing No. 505-1 at p. 5).

Previously, the Court overruled Defendants' objections to Plaintiffs' Rule 30(b)(6) deposition topic regarding "Werner's system for sending class members standardized text messages (i.e., messages that appear with the same or substantially similar text multiple times and to multiple recipients throughout the messaging data Werner produced) on their onboard devices, including any and all formulas, rules, policies, or practices governing when such standardized text messages were sent." (Filing No. 431 at p. 14).  Plaintiffs' stated relevance for this area of inquiry is that preformatted messages, and the circumstances under which Werner sends them to drivers over the road, implicate Werner's "class-wide policies and practices that bear on the compensability of drivers' time while they are over the road." (Filing No. 482 at p. 2). Importantly,

16

in the context of the parties' Rule 30(b)(6) dispute, Defendants did not argue the system and policies for sending preformatted messages/standardized text messages were not relevant; instead, Defendants required "more specificity" for what they believed was an "unclear request." (Filing No. 431-2 at p. 8). In overruling Defendants' objection, the Court recognized, "Werner must have some sort of system, process, program, or mechanism by which it sent standardized messages to its drivers (like the caution message Plaintiffs use as an example)." The Court understands Plaintiffs' RFPs to be an extension of this area of discovery.

Defendants state they should not be compelled to provide "training materials or documents that potentially contain fragmented and incomplete examples of message templates when the information requested by Plaintiffs have already been provided in its entirety through the messaging data," and that training documents are not responsive to Plaintiffs' actual RFPs. (Filing No. 459 at p. 13). But, training materials that contain the text of preformatted messages with directions, policies, practices, instructions, or the like regarding when/under what circumstances preformatted messages are sent to drivers over the road are exactly the kinds of documents Plaintiffs are seeking. Defendants assert that, even if an "individual message template may have been displayed as examples in documents for training purposes, that does not, as Plaintiffs imply, mean Werner has a record of or database containing all preformatted templates available on the messaging system during the class period." (Filing No. 459 at pp. 12-13). That may be true, but that does not mean Werner should not produce responsive documents in its possession, to the extent they exist.[6]

Accordingly, the Court will order Defendants to supplement their responses to these RFPs by producing all responsive documents in their possession responsive to these requests, including training materials that contain the text of preformatted messages. To the extent Defendants maintain they have already produced the text of preformatted messages in their data production, they shall supplement their response to direct Plaintiffs to identify specific documents and how to locate those documents within the produced data.

---

[6] Although Defendants are correct that Plaintiffs' RFPs do not specifically ask for "training materials," Defendants' acknowledgement that training materials contain the text of preformatted messages brings such materials within the ambit of Plaintiffs' requests.

4. *Plaintiffs' Contention Interrogatories and Interrogatories Nos. 32-33 re: cargo theft*

Plaintiffs ask the Court to overrule Defendants' objections to their contention interrogatories and to Interrogatory Nos. 32-33. Because some of Defendants' objections are premised upon their position that Plaintiffs exceeded the permissible number and scope of interrogatories as set forth in the two of the Court's February 2024 Orders, the Court will address the parties' arguments regarding both sets of interrogatories together.

In the Court's Order February 14, 2024, Order, it gave Plaintiffs leave to "withdraw their previously served and unanswered interrogatories" and "to serve Defendants with an additional total of 50 interrogatories, including discrete subparts." (Filing No. 424). On February 23, 2024, the Court additionally gave Plaintiffs leave "to serve Defendants with 18 contention interrogatories regarding the factual bases for their affirmative defenses," and stated those contention interrogatories "will not count . . . towards the previous additional 50 interrogatories Plaintiffs were permitted to serve per the Court's prior Order (Filing No. 424)." (Filing No. 431 at pp. 21-22). In finding Plaintiffs could serve 18 contention interrogatories (rather than depose Werner's Rule 30(b)(6) deponent about Werner's affirmative defenses), the Court stated, "Plaintiffs are . . . entitled to discover the factual underpinnings of Werner's eighteen affirmative defenses, which have only been generally pled." (Filing No. 431 at p. 21).

Following those orders, on February 23, 2024, the *Abarca* Plaintiffs served Defendants with 31 numbered Interrogatories. (Filing No. 462-7). Plaintiffs also served Defendants with 18 numbered Contention Interrogatories. (Filing No. 461-4). On April 29, 2024, Plaintiffs served Defendants with Interrogatory Nos. 32 and 33 (Second Set). (Filing No. 454 at p. 15).

Defendants have objected to answering Contention Interrogatories No. 3-5 and Interrogatory Nos. 32 and 33 (Second Set), in part because they believe Plaintiffs exceeded the number of permissible interrogatories they could serve under the Court's orders. Defendants argue that, although Plaintiffs only served 33 numbered "general" interrogatories, Interrogatory Nos. 11, 13, 15, and 17 constitute multiple separate interrogatories.[7] (Filing No. 459 at pp. 20-21). Specifically, Defendants assert those interrogatories "requested the effective date of 34 separate

---

[7] Interrogatory No. 10 asks Defendants to "Identify by bates number all versions of the document titled 'Agreement,' . . . that were used by WERNER from June 4, 2010 to November 6, 2023." Interrogatory No. 11 then asks Defendants to "State the effective dates for each version of the document titled 'Agreement' identified in response to Interrogatory No. 10." (Filing No. 462-7 at p. 7). Interrogatory Nos. 13, 15, and 17 follow a similar pattern as applied to different documents.

documents," so "[c]ounting their discrete subparts, these five interrogatories amounted to 34 separate interrogatories." Defendants therefore calculate "Plaintiffs actually served 60 interrogatories on February 23, 2024, in excess of the Court's 50 interrogatory limit." (Filing No. 459 at pp. 20-21). For that reason, Defendants objected to answering Interrogatory Nos. 32 and 33, and to answering Plaintiffs' Contention Interrogatory Nos. 3-5, which Defendants assert are not contention interrogatories authorized by the Court's prior order, and otherwise exceed the 50-interrogatory general interrogatory limit. Defendants also accurately point out that Plaintiffs failed to address these particular objections in Plaintiffs' brief supporting their motion to compel. (Filing No. 459 at p. 20).

Although Plaintiffs did not address the above objections in their opening brief, Plaintiffs reply that that Interrogatory Nos. 11, 13, 15, and 17 each asks a single question: the effective dates of the sequential versions of a form identified by bates number in the immediately preceding interrogatory. Plaintiffs contend, "The mere fact that an interrogatory may require identifying multiple dates or documents in a response does not transform it into multiple interrogatories." (Filing No. 482 at p. 16).

As discussed above in connection with Defendants' motion to compel Plaintiffs' answers to interrogatories, Rule 33(a)(1) provides, "Unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. P. 33(a)(1). The advisory committee's note to the 1993 amendment to Rule 33(a) states that discrete subparts are those "that seek information about discretely separate subjects." Fed. R. Civ. P. 33(a) advisory committee's note to 1993 amendment. This note has, however, been called a "rather cryptic and largely unhelpful summary." *Straight Arrow Prods., Inc. v. Mane Choice Hair Sol. LLC*, No. CV 20-4722, 2021 WL 4583849, at *2 (E.D. Pa. Oct. 6, 2021) (quoting *Erfindergemeinschaft Uropep GbR v. Eli Lilly and Co.*, 315 F.R.D. 191, 194 (E.D. Texas 2016)). Thus, "much ink has been spilled addressing the question of how interrogatory sections and subparts should be counted." *Id.* (quoting *Fouad v. Milton Hershey School and Trust*, Civ. A. No. 19-253, 2020 WL 3265245 at *4 (M.D. Pa. June 17, 2020)). Although courts have come to varying conclusions under different analyses, at a minimum, the "particular circumstances of the case should be considered, with an eye toward fairness" when counting discrete subparts. *Straight Arrow*, No. CV 20-4722, 2021 WL 4583849, at *5.

19

The Court agrees with Plaintiffs that Interrogatory Nos. 11, 13, 15, and 17 each asks a single question, and should not be multiplied by the number of documents identified by Defendants in their answers to the prior interrogatories.  This interpretation comports with this district's local rules for counting discrete subparts of interrogatories. The example used in the local rule states that the following question "is counted as 3 interrogatories: 'Please state the name, address, and telephone number of any witness to the accident set forth in the complaint.'" NECivR. 33.1(c). This example *does not* contemplate that if the answering party identifies five witnesses, asking for the name, address, and telephone number for each witness counts as fifteen interrogatories.  Had Plaintiffs asked Defendants in a single numbered interrogatory to "Identify by bates number all versions of the document titled 'Agreement,' . . . " and to "State the effective dates for each version of the document titled 'Agreement,' . . ." that clearly would be counted as two interrogatories— not a variable number of interrogatories depending on the number of documents identified in the responding party's answer.  If the Court followed Defendants' position, a party could almost never accurately plan and serve interrogatories within the Rule's limits because it would entirely depend on the responding party's answers.  See, e.g., *Straight Arrow*, No. CV 20-4722, 2021 WL 4583849, at *6 (concluding that in a trademark infringement case, "an interrogatory seeking information about multiple products does not need to be counted as the same number of interrogatories as the number of products"); *cf. Rambus, Inc. v. NVIDIA Corp.*, Case No. C-08-03343, 2011 WL 11746749 (N.D. Cal. Aug 24, 2011) ("An interrogatory that seeks information (even a single piece of information) about 300 separate products is asking 300 separate questions."). The Court's conclusion here is consistent with the Court's conclusion—and Defendants' position—regarding the parties' dispute over the number of interrogatories Defendants served upon Plaintiffs as discussed above in Defendants' motion to compel: Defendants' interrogatories were counted on their face and were not multiplied by the number of responding parties. Likewise, Plaintiffs' interrogatories are counted on their face and are not multiplied by Defendants' variable answers. Therefore, the Court will overrule Defendants' objections to interrogatories on the basis that Plaintiffs exceeded the limits set forth in the Court's February 2024 Orders.

The Court next turns to Defendants' substantive objections and answers to Plaintiffs' Contention Interrogatories. Plaintiffs assert Defendants have refused to answer their Contention Interrogatories No. 3-5 outright, and, in response to Contention Interrogatories No. 1, 2, 12-14, and 16-18, assert Defendants "copied and pasted" their responses to Plaintiffs' previously served

interrogatories rather than addressing the specific questions set out in the new requests, providing answers that "largely recite legal conclusions rather than disclosing any facts." (Filing No. 454 at p. 12). Defendants respond that they have disclosed the factual bases for their affirmative defenses in response to Plaintiffs' contention interrogatories within the scope of the Court's February 23, 2024, Order.  Defendants state they did not respond to Contention Interrogatories No. 3-5 because they did not comply with the Court's "unambiguous language permitting 'Plaintiffs to serve Defendants with 18 contention interrogatories" in order "'to discover the factual underpinnings of Werner's eighteen affirmative defenses.'" (Filing No. 459 at p. 14) (quoting Filing No. 431 at p. 21). Defendants contend Plaintiffs have attempted to circumvent the Court's directives and, in addition to serving contention interrogatories inquiring into Defendants' affirmative defenses, served interrogatories outside of the scope of the Court's Order and in excess of the fifty general interrogatory limit. *Id.*

First, the Court will overrule Defendants' objections to Plaintiffs' Contention Interrogatories based upon their position they violate the Court's orders. In providing Plaintiffs with leave to serve eighteen "contention" interrogatories, the Court found "Plaintiffs are still entitled to discover the factual underpinnings of Werner's eighteen affirmative defenses, which have only been generally pled," and granted Plaintiffs leave to serve interrogatories "regarding the factual bases for their affirmative defenses." (Filing No. 431 at pp. 21-22).  Even if the Court agreed with Defendants that certain Contention Interrogatories were not specifically authorized as one of the 18 contention interrogatories Plaintiffs were permitted to serve, as discussed above, Plaintiffs did not use all fifty of their general interrogatories, and therefore those interrogatories were otherwise permissibly served.  Accordingly, the Court overrules Defendants' objections as "beyond the scope of the Court's February 23, 2024, Order" as to Contention Interrogatory Nos. 1-5, and 12-17. Defendants did not answer Contention Interrogatory Nos. 3-5 at all based upon that objection, and therefore the Court orders Defendants to fully answer Contention Interrogatory Nos. 3-5.

Plaintiffs further argue Defendants' answers to Contention Interrogatories No. 1, 2, 12-14, and 16-18, are insufficient. Plaintiffs point specifically to Defendants' answer regarding their second affirmative defense (that Plaintiffs' claims and those of the putative class members are barred in whole or in part because California laws do not apply to Plaintiffs or the putative class members, see Filing No. 224 at p. 9).  Defendants answered that California did not "serve[] as the[]

base of work operations" of some California Class Members, and that "the California Class includes drivers to whom California law does not apply," which Plaintiffs state are legal conclusions, not facts. (Filing No. 454 at p. 12). Defendants respond, "Plaintiffs are simply incorrect" when they contend Defendants provided incomplete responses, and that a review of their answers demonstrates they did "provide thorough factual bases for this contention and others made in support of its affirmative defenses." (Filing No. 459 at p. 15).

The Court has reviewed Defendants' answers to Plaintiffs' Contention Interrogatories. (Filing No. 461-4). Aside from the objections overruled above, the Court generally finds Defendants have adequately answered Plaintiffs' contention interrogatories. For example, Contention Interrogatory No. 6 asks, "State all facts supporting WERNER's contention that Plaintiffs' and/or CLASS MEMBERS' claims are preempted by the Due Process Clause."[8] Defendants then provide a 2.5-page answer identifying the federal laws they believe preempt Plaintiffs' claims, directing Plaintiffs to the location where Defendants' principal facts supporting this defense can be found, and otherwise outlining this affirmative defense. (Filing No. 461-4 at pp. 5-7). Additionally, several of Defendants' affirmative defense are primarily legal defenses regarding preemption rather than fact dependent affirmative defenses. See, e.g., Contention Interrogatory No. 7 (preemption by Full Faith and Credit Clause), No. 8 (preemption by Federal Motor Carrier Safety Regulations), No. 9 (preemption by Federal Hazardous Material Transportation Law), No. 10 (preemption by Federal Aviation Administration Authorization Act). Therefore, the Court will not order Defendants to further answer Plaintiffs' Contention Interrogatories, aside from Nos. 3-5 as stated above.

Defendants maintain their additional objections to Plaintiff's general Interrogatory Nos. 32-33 on grounds of relevance, overbreadth, vagueness, undue burden, and proportionality. Interrogatory No. 32 asks, "For each year from 2010 through 2023, inclusive, state the total number

---

[8] Each of Plaintiffs' Contention Interrogatories ask Defendants to "State all facts[.]" However, "A contention interrogatory will be considered overly broad and unduly burdensome if it seeks 'all facts' supporting a claim or defense, such that the answering party is required to provide a narrative account of its case." *Smartmatic USA Corp. v. Lindell*, No. 22-CV-98 (WMW/JFD), 2023 WL 6890929, at *7 (D. Minn. Oct. 19, 2023) (internal quotation marks and citation omitted). "But overbroad contention interrogatories may be 'readily corrected by limiting the request to principal or material facts' related to an allegation." *Id.* (quoting *Kinetic Co. v. Medtronic, Inc.*, No. 08-CV-6062 (JMR/AJB), 2010 WL 11561275, at *4 (D. Minn. Nov. 23, 2010)) (internal quotation marks omitted); see also *Hein v. State Farm Mut. Auto. Ins. Co.*, No. 5:22-CV-05045-LLP, 2023 WL 5804018, at *5 (D.S.D. Sept. 7, 2023) ("When faced with contention interrogatories with overly broad language, courts typically direct that an answer still be provided but narrow the scope of the needed response to the 'material' or 'principal' facts supporting a specific claim or defense.").

of incidents reported to Werner where cargo was reported stolen." Interrogatory No. 33 asks for the aggregate dollar value of those incidents.  (Filing No. 454 at p. 15).

Plaintiffs assert that drivers' duties "related to the security of their trucks and trailers, including the risk of cargo theft faced while remaining with vehicles on multiday tours of duty," are relevant to their claims.  (Filing No. 454 at pp. 15-16).  Plaintiffs argue "the existence of cargo theft risk is essential to understanding the working conditions and responsibilities of all drivers, regardless of class member status," and that "Information about cargo theft goes directly to Werner's expectations for drivers to maintain constant vigilance over their loads, which in turn bears on whether Werner's policies effectively prevented drivers from taking required breaks and recording all compensable time," and "[t]he frequency of theft incidents and the consequences to drivers when theft occurred are probative of the pressures Werner placed on drivers and the reasonableness of its policies." (Filing No. 482 at p. 18).

Defendants argue these interrogatories encompass data on cargo theft incidents that involve non-class members and occurred outside of the class period.  Defendants further argue Plaintiffs have failed to establish how cargo theft data has any bearing on whether class members were paid all wages owed to them under California or Nebraska law aside from Plaintiffs' "vague assertions" that a driver's duties "related to the security of their trucks and trailers, including the risk of cargo theft," are relevant to their claims.  (Filing No. 459 at p. 21).  Defendants assert it would be a "monumental burden" to have to conduct an extensive search and analyze "countless incident reports over 14 years" to determine which reports involved stolen cargo. *Id.*

The Court agrees with Defendants and will sustain their objections to Interrogatory Nos. 32-33. These interrogatories, as written, are plainly overbroad. These interrogatories are not limited to class members, and Plaintiffs have not adequately demonstrated or otherwise explained how the total number of incidents and dollar value of Werner's cargo theft over a 13-year period is relevant to any claim or defense, or proportional to the needs of this case.  Accordingly, the Court will not order Defendants to answer these interrogatories.

> 5. *Plaintiffs' Requests for Production No. 7 and 8 (Eleventh Set), seeking job descriptions and job duties of Werner employees identified as fact witnesses in supplemental disclosures served on February 16, 2024*

Plaintiffs' Requests for Production No. 7 and 8 (Eleventh Set) seek the "current and historical job descriptions" or other documents "sufficient to show the actual duties performed by" the non-driver employees identified in Werner's Rule 26(a)(1) disclosures. Defendants produced a job posting for an "Enterprise Architect" and stated it was unaware of any other responsive documents. Plaintiffs seek job descriptions for any of the following roles: senior director of accounting administration; vice president of safety, compliance, and terminal management; principal software engineer; director – dedicated; senior vice president of van/expedited division and van customer services; vice president of operations and customer service; and senior director of driver recruiting. (Filing No. 454 at p. 13). Plaintiffs assert "they cannot begin to prepare to cross-examine these individuals" because they have no way of "understanding their job duties." (Filing No. 454 at p. 14).

Defendants represent that the documents already provided in response to this request represent the entirety of the responsive documents in their possession. (Filing No. 459 at pp. 16-17). Defendants state they have "never created" job descriptions or other documents describing the job duties of the upper-level managerial witnesses identified in its Rule 26(a)(1) disclosures because, as with many high-level executive and managerial roles, Defendants do not maintain job descriptions for these roles. Defendants further respond that Plaintiffs already deposed multiple of those individuals, during which Plaintiffs were able to "thoroughly explore[]" those individuals' job duties. (Filing No. 459 at p. 17).

While Plaintiffs reply that it is implausible that Defendants have no responsive documents, Defendants state they have none. As discussed above, "The parties have a duty to provide true, explicit, responsive, complete and candid answers to discovery, . . . and their attorneys have a continuing duty to advise their clients of their duty to make, as well as the spectrum of sanctions they face for violating that duty." *Wagner*, 208 F.R.D. at 609. "Providing false or incomplete discovery responses violates the Federal Rules of Civil Procedure and subjects the offending party and its counsel to sanctions." *Id.* at 610 (citing *Hogue v. Fruehauf Corp.*, 151 F.R.D. 635, 637 (N.D.Ill. 1993). And, under Fed. R. Civ. P. 34(a)(1), parties can only be compelled to produce documents in their "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). Although Plaintiffs assert it is "implausible" that Defendants have no responsive documents, the Court will not assume defense counsel is not being candid with opposing counsel or the Court in derogation of the duty to make "honest, complete, non-evasive discovery disclosures." See *Wagner*, 208 F.R.D. at 609.

The Court cannot order Defendants to produce documents they never created or do not have.  See *Cody Foster & Co. v. Urb. Outfitters, Inc.*, No. 8:14CV80, 2015 WL 4366162, at *6 (D. Neb. July 16, 2015) ("Defendants cannot be ordered to produce what they do not have and cannot reasonably obtain."). Under the circumstances, Defendants shall formally verify under oath that either no responsive documents exist, or if they exist, that all responsive documents have been disclosed. See *Wagner*, 208 F.R.D. at 609-10.

6. *Plaintiffs' Requests for Production No. 2-10 (Fourth Set) and No. 1 (Twelfth Set), seeking the "TSACDRVP" data table*

Finally, Plaintiffs seek production of a specific data table—the TSACDRVP table— identified by one of Werner's corporate representatives, Jason Cobb, in his March 8, 2024, deposition. Cobb testified the TSACDRVP table contains "the information necessary to connect the otherwise arbitrary 'Stakeholder IDs' in the GPS data to specific driver identification numbers," without which Stakeholder IDs "are meaningless" with "no way to determine which messages were associated with which drivers."  Plaintiffs therefore assert this table "is critical to making sense of the messaging data[.]" (Filing No. 454 at p. 14).

After Cobb's deposition, Plaintiffs served RFP No. 1 (Twelfth Set), specifically asking Defendants to produce, in csv format, "all records" from the TSACDRVP table referenced by Mr. Cobb in his deposition[.]" (Filing No. 462-5 at p. 3)  Plaintiffs further assert the TSACDRVP table was responsive to their RFP Nos. 2-10 (Fourth Set) asking for documents in csv format showing "the precise time and date" that each class member was in layover status (No. 2), was with one of Defendants' trucks awaiting its repair (No. 3), was with one of Defendants' trucks awaiting another one of Defendants' drivers to take over the load pursuant to a repower (No. 4), was at a customer's facility (No. 5), signed in or out with security at a customer's facility (No. 6), completed paperwork relating to his or her job with Defendants or submitted paperwork to a customer or to Defendants while at a customer's facility (No. 7), was on detention at a customer's facility (No. 8), witnessed or participated in the breaking of the seal on the tractor trailer door of one of Defendants' trailers at a customer's facility (No. 9), and was free of any job duties and not working while at a customer's facility (No. 10).

Defendants object to RFP No. 1 (Twelfth Set)'s request for "all records" from the TSACDRVP table as an overly broad request on its face.  Defendants did agree to provide Plaintiffs

with the relevant portion of the TSACDRVP table linking the Stakeholder IDs to Employee IDs, which is the reason why Plaintiffs claim they need this table, and Plaintiffs do not otherwise explain the relevance or need for the entire TSACDRVP table, which contains other data that does not link Stakeholder ID to Employee ID and contains records for drivers who are not members of the class. (Filing No. 459 at p. 18). Defendants also dispute Plaintiffs' assertion that the data in the TSACDRVP table was requested in previous RFPs. (*Id.* at fn. 2). Defendants further state the "Stakeholder ID" column in the messaging data first came into use after Werner transitioned from Omnitracs to Telematics, which process was completed by early 2021, and as such the "Stakeholder ID" information already appears in the messaging data for a portion of the class period beginning in 2020 and thereafter.

Plaintiffs reject Defendants' suggestion of what they characterize as a "made for litigation" document that links stakeholder IDs to driver numbers because "it would not be admissible at trial," and Plaintiffs "would be forced to take discovery regarding how Werner created the document" and it would be less reliable. (Filing No. 454 at pp. 14-15). Defendants respond that they offered to extract the relevant data from the table, which is how they have produced the majority of their data throughout this case. (Filing No. 459 at p. 19). Defendants proposed extracting data connecting Stakeholder ID to Driver ID for the class members in this case from a larger data table that is created in the regular course of business. Defendants contend their proposal to extract portions of a business record to respond to Plaintiffs' request for production, while refraining from producing different portions of that table unrelated to Stakeholder IDs, does not amount to Defendants creating a "made-for-litigation" document. *Id.* at 19-20. Plaintiffs do not object to Werner removing non-class member information from the table, but continue to assert the entire table should otherwise be produced. Plaintiffs maintain that "[t]he complete table is necessary for Plaintiffs to thoroughly understand and analyze the messaging data as it pertains to the certified class." (Filing No. 482 at p. 12).

Plaintiffs concede that the only relevance of the TSACDRVP table is to obtain "the information necessary to connect the otherwise arbitrary 'Stakeholder IDs' in the GPS data to specific driver identification numbers." Defendants have agreed to provide to Plaintiffs with the data and information to do just that. Rule 26(b)(2)(C) requires the court to "limit the frequency or extent of discovery" if it determines "the discovery sought . . . can be obtained from some other source that is more convenient, less burdensome, or less expensive" or is "outside the scope

permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(i), (iii). Additionally, the discovery rules should "'be construed to secure the just, speedy, and inexpensive determination of every action'" . . . judges should not hesitate to exercise appropriate control over the discovery process." *Blackmore*, No. 8:21CV318, 2022 WL 3718115, at *5. Under the circumstances, Defendants' agreement to provide Plaintiffs with an extraction of the relevant data from the TSACDRVP table linking the Stakeholder IDs to Employee IDs is the most proportional and reasonable response to this request. Plaintiffs' concerns about additional discovery or the admissibility of the data are unfounded, particularly given that Defendants have similarly provided Plaintiffs with data extractions of records from larger data tables throughout this litigation.  Accordingly, the Court will order Defendants to produce the data extraction necessary to connect Stakeholder ID to Driver ID for the class members, but will not require Defendants to produce the entire TSACDRVP table.

Accordingly,

**IT IS ORDERED:**

1. Defendants' Motion to Compel (Filing No. 450 in the Lead Case, et al.) is granted.
2. Plaintiffs' Motion to Compel Responses to Interrogatories and Requests for Production (Filing No. 453 in the Lead Case, et al.) is granted, in part, and denied in part, as set forth above.
3. The parties shall serve their supplemental answers to interrogatories and supplemental discovery as set forth above within 30-days of this Order.
4. Per the Court's Text Order (Filing No. 535), counsel shall contact the chambers of the undersigned magistrate judge within 7-days to schedule a status conference.

Dated this 21st day of January, 2025.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

27